United States Court of Appeals,

Eleventh Circuit.

No. 95-6243.

Cassandra JENKINS, a minor, by her mother and next friend, Sandra HALL; Oneika McKenzie, a minor, by her mother and next friend, Elizabeth McKenzie, Plaintiffs-Appellants,

v.

TALLADEGA CITY BOARD of EDUCATION; Susannah Herring, individually and in her capacity as a teacher of Graham Elementary School, Melba Sirmon, individually and in her capacity as counselor at Graham Elementary School, Defendants-Appellees,

Charles Kurley, in his official capacity as Superintendent of the Talladega City School District, et al., Defendants.

June 2, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. 94-PT-739-E), Robert B. Propst, Judge.

Before HATCHETT, Chief Judge, TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and KRAVITCH[*], Senior Circuit Judge.

BIRCH, Circuit Judge:

This case involves the application of the well-established precepts of qualified immunity to a specific set of facts that concern a search of elementary school-children who were suspected of having stolen money from a classmate. The district court granted summary judgment in favor of the defendants on all claims. For the reasons that follow, we affirm.

I. BACKGROUND

Certain critical facts in this case are disputed by the parties. For the limited purpose of our analysis of the issue of qualified immunity at the summary judgment stage, we are bound to view the facts in the light most favorable to the plaintiffs. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). In 1992, at the time the events giving rise to this action occurred, Cassandra Jenkins and Oneika McKenzie were eight-year-old second graders in elementary school in Talladega, Alabama. On the afternoon of May 1, one of Jenkins'

[*]Senior U.S. Circuit Judge Phyllis A. Kravitch elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

and McKenzie's classmates informed their teacher, Hilda Fannin, that $7.00 was missing from her purse. Based on a student's accusation that Jenkins had placed the money in McKenzie's backpack, Fannin initially searched the backpack but failed to find the money there. Several students subsequently implicated Jenkins, McKenzie, and a male classmate, Anthony Jamerson, in the alleged theft. Fannin took the children into the hallway and questioned them regarding the money, at which time Jenkins and McKenzie mutually accused each other of the theft. At the suggestion of another teacher, Susannah Herring, Fannin asked the students to remove their socks and shoes. When these efforts failed to reveal the allegedly stolen money, Herring, along with a guidance counselor, Melba Sirmon, who had by this time become involved in the situation, directed Jenkins and McKenzie to the girls' restroom. Jenkins testified that Herring ordered them to enter the bathroom stalls and come back out with their underpants down to their ankles. McKenzie offered conflicting testimony as to whether they were instructed to put their clothes back on while inside the bathroom stall or exit the stalls unclothed. Jenkins' and McKenzie's testimony is consistent, however, with respect to the assertion that they were asked to remove their clothes while inside the restroom.

Having again failed to discover the missing money, Herring and Sirmon brought Jenkins, McKenzie, and Jamerson to the office of the school principal, Crawford Nelson. In response to Nelson's inquiries regarding the money, Jamerson volunteered that it was hidden behind a file cabinet. A search in that location failed to uncover the money. Jenkins and McKenzie both contend that Herring then escorted them to the restroom a second time where they were again asked to remove their clothes in an effort to locate the $7.00.

The parents of Jenkins and McKenzie filed a complaint on their behalf against the Talladega City Board of Education and nine individual defendants. In the complaint, the plaintiffs alleged, pursuant to 42 U.S.C. § 1983, that Jenkins and McKenzie had been strip-searched in violation of their rights provided under the Fourth and Fourteenth Amendments. In addition, the complaint set forth violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and Alabama law. In a series of memorandum

opinions, the district court dismissed all claims for money damages and granted summary judgment in favor of (1) all defendants on plaintiffs' Title VI and Title IX claims; (2) the Board of Education with respect to the plaintiffs' § 1983 claims; (3) all individually-named defendants on the basis of qualified immunity; and (4) all defendants on all remaining federal claims for injunctive and declaratory relief, and all state law claims. We affirm the district court's disposition of this case in its entirety. Because we believe that the only issue raised in this appeal that warrants further examination concerns the court's determination that the individual defendants are entitled to qualified immunity with respect to the plaintiffs' Fourth Amendment § 1983 claims, our discussion is confined solely to this issue.

## II. DISCUSSION

The principles of qualified immunity set out in *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146 (11th Cir.1994) (en banc), continue to be the guiding directives for deciding cases involving the question of a state actor's entitlement to qualified immunity in this circuit. Although these rules have been identified on numerous occasions, we reiterate some of them here to establish and clarify the framework that necessarily informs our analysis of the issue before us. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter,* 28 F.3d at 1149 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Lassiter,* 28 F.3d at 1150. Plaintiffs submit that on May 1, 1992, the law

regarding the constitutionally permissible scope of a search of students while attending school was so clearly defined that these defendants were on notice that the type of search conducted in this instance violated Jenkins' and McKenzie's rights guaranteed by the Fourth Amendment. In support of this proposition, plaintiffs point to the Supreme Court's application of the Fourth Amendment in the context of school searches in *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).[1]  *T.L.O.* involved the search of a fourteen-year-old high school student's purse after the student was discovered smoking in the lavatory in violation of school rules. More specifically, a teacher found T.L.O. and a companion smoking in the restroom and took them to the principal's office where, in the presence of the assistant vice principal, the companion admitted—and T.L.O denied—having committed the infraction with which they were accused. The vice principal proceeded to examine T.L.O.'s purse to ascertain whether it contained cigarettes. When the search revealed a pack of cigarettes, the vice principal removed the pack and observed within the purse a package of rolling papers. Further exploration revealed the presence of a small quantity of marijuana along with several items of drug paraphernalia.

The Supreme Court determined at the outset that the Fourth Amendment applied to searches conducted by school authorities. *T.L.O.,* 469 U.S. at 335, 105 S.Ct. at 740. The Court, however, rejected the proposition that searches within the school setting must be based on probable cause as that term is understood in the context of Fourth Amendment jurisprudence; rather, the Court articulated the following standard to guide a pragmatic analysis of Fourth Amendment claims of this sort:

> [T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception"; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting

---

[1]The parties agree that, at the time the events giving rise to this action occurred, *T.L.O.* was the only case that had addressed with any specificity the Fourth Amendment implications of school searches. As a result, it is uncontested that, under the facts of this case, *T.L.O.* is the sole precedent that potentially could have clearly established the law for purposes of qualified immunity analysis.

that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.,* 469 U.S. at 341-42, 105 S.Ct. at 742-43 (citations omitted). Plaintiffs acknowledge that the factual circumstances set forth in *T.L.O.* differ significantly from those present in this action, but suggest that the aforementioned language sufficiently delineated the factors that necessarily must inform school authorities who seek to search a student suspected of breaching a school regulation such that the defendants in this case reasonably must have known that their search of Jenkins and McKenzie—and particularly that aspect of the search that involved the removal of articles of clothing—exceeded the bounds of "reasonableness" established by the Court in *T.L.O.* We disagree.[2]

Notwithstanding the Court's enunciation in *T.L.O.* of a two-part test to adjudicate Fourth Amendment school-search claims, the Court did not apply its own test strictly to the facts presented in that case; indeed, after finding that the initial decision to open T.L.O.'s purse to search for cigarettes was justified in light of a teacher's report that the student had been smoking in the restroom, the Court concluded that

[t]he suspicion upon which the search for marihuana was founded was provided when Mr. Choplick observed a package of rolling papers in the purse as he removed the pack of cigarettes.... The discovery of the rolling papers concededly gave rise to a reasonable suspicion that T.L.O. was carrying marihuana as well as cigarettes in her purse. This suspicion justified further exploration of T.L.O.'s purse, which turned up more evidence of drug-related activities.... Under these circumstances, it was not unreasonable to extend the search to a separate zippered compartment of the purse; and when a search of that compartment revealed an index card containing a list of "people who owe me money" as well as two letters, the inference that T.L.O. was involved in marihuana trafficking was substantial enough to justify Mr. Choplick in examining the letters to determine whether they contained any further evidence. In short, we cannot conclude that the search for marihuana was unreasonable in any respect.

*T.L.O.,* 469 U.S. at 347, 105 S.Ct. at 745-46. Specific application of the factors established to define the constitutionally permissible parameters of a school search—that is, that it be "reasonably related to the objectives of the search" and "not excessively intrusive in light of the age and sex of the

---

[2]Because we conclude that, on May 1, 1992, the law regarding school searches was not clearly established to the extent that these defendants should have known that their conduct violated constitutionally permissible norms, we need not reach the question of whether Jenkins' and McKenzie's Fourth Amendment rights were, in fact, violated.

student and the nature of the infraction"—is notably absent from the Court's discussion and conclusion with respect to T.L.O. The Court's determination is grounded solely in the notion that each successive discovery of items in T.L.O.'s purse by the vice principal provided reasonable suspicion and thereby legitimated further searching. There is no illustration, indication, or hint as to *how* the enumerated factors might come into play when other concrete circumstances are faced by school personnel.[3]

---

[3]The dissent contends that the Supreme Court's recent decision in *United States v. Lanier,* --- U.S. ----, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), calls into question our conclusion that *T.L.O.,* while establishing general principles that necessarily must govern any Fourth Amendment analysis of a school search, did not explicitly apply those principles to specific facts such that the defendants—and any reasonable individuals faced with the same circumstances—should have known that their conduct in this case violated clearly established constitutional norms. *Lanier,* however, is entirely consistent with both the reasoning and result reached by our court in this case.

> *Lanier* concerned a challenge to a criminal conviction under 18 U.S.C. § 242, the criminal-law counterpart to 42 U.S.C. § 1983. The underlying conduct giving rise to the criminal civil rights violation involved numerous sexual assaults committed by a state court judge. The Sixth Circuit initially affirmed the conviction, 33 F.3d 639, but on rehearing *en banc,* reversed after finding that the statute failed to supply adequate notice that sexual assault by a state actor fell within the parameters of constitutionally prohibited conduct. *See United States v. Lanier,* 73 F.3d 1380, 1384 (6th Cir.1996) (en banc). The court further noted that the right violated in this case had not been identified with sufficient clarity as a constitutional right:

Note 3—Continued

> > The right deprived in the instant case—the right not to be assaulted—is a clear right under state law known to every reasonable person. The defendant certainly knew his conduct violated the law. But it is not publicly known or understood that this right rises to the level of a "constitutional right." It has not been declared such by the Supreme Court.... The indictment in this case for a previously unknown, undeclared and undefined constitutional crime cannot be allowed to stand.

> *Lanier,* 73 F.3d at 1392-94. In reaching its determination that the contours of the right at issue had not previously been delineated, the court reasoned that, consistent with Supreme Court precedent, a constitutional right under § 242 must be "ma[d]e specific" to render the indictment under the statute constitutionally sound:

> > As we interpret the "make specific" requirement, the Supreme Court must not only enunciate the existence of a right, it must also hold that the right applies to a factual situation fundamentally similar to the one at bar.... The "make specific" standard is substantially higher than the "clearly established" standard used to judge qualified immunity in section 1983 cases.

> *Id.* at 1393.

In the absence of detailed guidance, no reasonable school official could glean from these

_____

The Supreme Court granted certiorari "to review the standard for determining whether particular conduct falls within the range of criminal liability under § 242." *Lanier,* --- U.S. at ----, 117 S.Ct. at 1224. In reversing the Sixth Circuit's decision, the Court observed that the necessity for a constitutional right to be "made specific" stemmed from the constitutional requirement that individuals be given fair warning as to what constitutes proscribed conduct; consistent with this requirement, the Court concluded that, contrary to the Sixth Circuit's stated view, the "made specific" standard was identical to the "clearly established" standard employed in qualified immunity cases:

> In the civil sphere, we have explained that qualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right. So conceived, the object of the "clearly establish" immunity standard is not different from that of "fair warning" as it relates to law "made specific" for the purpose of validly applying § 242.... [As] with civil liability under § 1983 or Bivens, all that can usefully be said about criminal liability under § 242 is that it may be imposed for deprivation of a constitutional right if, but only if, in light of pre-existing law the unlawfulness under the Constitution is apparent. Where it is, the constitutional requirement of fair warning is satisfied.

*Lanier,* --- U.S. at ---- - ----, 117 S.Ct. at 1227-28 (citations, quotations and internal markings omitted). It is true that the Court described the appropriate standard as being whether the unlawfulness is *apparent* in light of preexisting law. Although this circuit has elaborated and said that "preexisting law must dictate, that is, truly compel (not just suggest or allow or raise a question about)" the unlawfulness of the challenged conduct, *Lassiter,* 28 F.3d at 1150, we do not believe that our elaboration indicates a standard substantively different from that of the Supreme Court. The Court in *Lanier* does not address or alter in any way our understanding of the underlying purpose or legal framework with respect to qualified immunity; rather, the Court's holding equates the standard of specificity required to provide fair warning in a criminal context under § 242 with that required to clearly establish the law for purposes of civil liability.

The dissent also points to the Court's declaration that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful'." *Id.* at ----, 117 S.Ct. at 1227. The Court went on to note that "[t]he easiest cases don't even arise. There has never been ... a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." *Id.* (quoting *Lanier,* 73 F.3d at 1410) (Daughtrey, J. dissenting). We do not believe our decision today suggests a view of qualified immunity contrary to the spirit of the preceding statements; indeed, although general principles of law *can* provide fair warning, they do not *necessarily* provide such warning unless the constitutional rule at issue may be applied "with obvious clarity." As acknowledged by the dissent, the question is whether *T.L.O.* established "with obvious clarity" that the school search at issue was unNote 3—Continued constitutional. Put simply, we do not think this is an "easy" case, nor do we view *T.L.O.* as applicable to the instant facts "with obvious clarity."

broadly-worded phrases whether the search of a younger or older student might be deemed more or less intrusive;  whether the search of a boy or girl is more or less reasonable, and at what age or grade level;  and what constitutes an infraction great enough to warrant a constitutionally reasonable search or, conversely, minor enough such that a search of property or person would be characterized as unreasonable.  In short, as conceded by the plaintiffs, neither the Supreme Court nor any court in this circuit nor the Alabama courts, on or before May 1, 1992, had ever actually applied the test established in *T.L.O.* to define a reasonable (or unreasonable) search in the context of facts materially similar to those of this school search.[4]  Without such practical, fact-based application, school officials in this circuit were left to interpret, balance, and evaluate such terms as "measures ... reasonably related to the objectives of the search," and "not excessively intrusive in light of the age and sex of the student and the nature of the infraction."  *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at

_____

[4]In this circuit, the law can be "clearly established" for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.  *Hamilton v. Cannon,* 80 F.3d 1525, 1532 n. 7 (11th Cir.1996) (citing *Courson v. McMillian,* 939 F.2d 1479, 1497-98 & n. 32 (11th Cir.1991)).  The dissent notes a "tension" between our circuit's decisional law deeming relevant solely in-circuit precedent, on the one hand, and the Supreme Court's seeming rejection in *Lanier,* on the other hand, of a categorical rule prohibiting consideration of decisions of the Court of Appeals or other courts to ascertain whether the law has been clearly established.  Significantly, however, the Supreme Court's discussion of the relevance of case law from other courts arose in the context of the Court's pointed criticism and rejection of the Sixth Circuit's determination that only Supreme Court precedent could clearly establish the law for purposes of 18 U.S.C. § 242.  In *United States v. Lanier,* 73 F.3d 1380 (6th Cir.1996) (en banc), the Sixth Circuit had held explicitly that "[l]ower court decisions are not sufficient to establish and make definite a particular constitutional crime so as to provide the constitutionally-required notice necessary to support an indictment under § 242.  Only a decision of the Supreme Court establishing the constitutional crime under § 242 can provide such notice."  *Id.* at 1393.  In reviewing the Sixth Circuit's decision, the Supreme Court explicitly rejected the notion that only its decisions could provide fair warning under the applicable statute;  rather, the Court stated that, in inquiring whether a previous judicial decision has made specific the scope of a constitutional right, "no ... case has held that the universe of relevant interpretive decisions is confined to our opinions."  *Lanier,* --- U.S. at ----, 117 S.Ct. at 1225.  Indeed, the "universe of interpretive decisions" to which our court looks is broader than that envisioned by the Sixth Circuit and includes, as suggested by the Supreme Court, our own circuit precedent and that of the highest state court where the pertinent conduct took place.  The Supreme Court in *Lanier* simply did not address the extent to which decisions of the "lower courts" must, should, or may be considered in deciding whether a constitutional right has been clearly established, nor did it identify any impropriety in considering only the decisions of the circuit or highest court of the state in which the relevant events took place.  We therefore do not construe *Lanier* as being in conflict with our precedent regarding the relevant decisional law to which we must look in analyzing a claim of qualified immunity.

743. As we have previously noted, "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *dissent approved en banc,* 998 F.2d 923 (11th Cir.1993) (per curiam). Similarly, school officials cannot be required to construe general legal formulations that have not once been applied to a specific set of facts by any binding judicial authority.[5]

Indeed, not only does the language used by the Court to announce a legal standard regarding the permissible scope of a reasonable school search lack specificity[6] but, it appears, purposefully so.

---

[5]The dissent submits that although the initial search of McKenzie's backpack was justified, the subsequent searches of Jenkins and McKenzie were not based on reasonable suspicion. The dissent further criticizes our decision as failing to evaluate whether the teachers had reasonable suspicion to perform the challenged searches in the bathroom. Once the teachers formed reasonable suspicion that Jenkins and McKenzie might have stolen the money, however, the search was then "justified at its inception." *T.L.O.,* 469 U.S. at 341-42, 105 S.Ct. at 742-43. The relevant question with respect to the *continuation* of the search, in our view, is not whether the teachers had reasonable suspicion with respect to each place they searched but, rather, whether the search itself was constitutionally reasonable in scope. Stated differently, once the teachers formulated reasonable suspicion that Jenkins and McKenzie had stolen the money (a fact that the dissent does not dispute), the relevant inquiry is whether *T.L.O.* directed the conclusion that the manner in which the teachers chose to conduct further searching exceeded constitutionally permissible bounds in *extent and scope.* The teachers, after all, still had reasonable suspicion that money had been stolen, and had not necessarily eliminated Jenkins and McKenzie as suspects when the backpack-search proved fruitless. Contrary to the dissent's suggestion, we have not ignored the question of reasonable suspicion but believe that the pertinent issue in this case is whether, at the time these events took place, the law was clearly established that all individuals in the defendants' place should have known that, after reasonable suspicion was formed that McKenzie and Jenkins might have stolen the missing money and an initial search of the backpack failed to reveal the money, the *continued* searching of these girls in the restroom exceeded the scope of a constitutionally permissible school search.

> With respect to the scope of the searches, it is apparent that the instant searches were reasonably related to the objective of uncovering the stolen $7.00. We also reject appellants' attempt to trivialize the nature of the infraction; the stealing of $7.00 in an elementary classroom reasonably could be considered by the school officials to be a matter of serious concern. Appellants' primary argument is that the searches were excessively intrusive. However, the female students were searched by female teachers. The students were eight years old, and thus prepubescent. Finally, it is a matter of common experience that teachers frequently assist students of that age in the bathroom, e.g., in the event of an accidental wetting. We do not believe that it would be apparent to a reasonable school official that the challenged searches were "excessively intrusive in light of the age and sex of the student[s] and the nature of the infraction." *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 743.

[6]It is worth noting that the dissenting justices in *T.L.O.* criticized the majority's reliance on the "reasonableness" test precisely because it is ambiguous and imprecise. Justice Brennan, joined

In response to Justice Stevens' criticism of this standard on the ground, among others, that the Court had failed to distinguish between types of infractions that might reasonably justify a search, Justice White, writing for the majority, explained:

> We are unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of various school rules. The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities.... The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should, as a general matter, defer to that judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not.

*T.L.O.,* 469 U.S. at 342 n. 9, 105 S.Ct. at 743 n. 9. The foregoing discussion not only indicates the Court's deliberate hesitation to narrow and define explicitly, in a practical, factual sense, the terminology used to establish its "reasonableness" test but, more importantly, further suggests that *T.L.O.* did not attempt to establish clearly the contours of a Fourth Amendment right as applied to the wide variety of possible school settings different from those involved in *T.L.O.* Faced with a series of abstractions, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other, it is difficult to discern how *T.L.O.* could be interpreted to compel the conclusion that these defendants—or, more accurately, all reasonable educators standing in defendants' place—should have known that their conduct violated a clearly established constitutional

---

by Justice Marshall, described the Court's standard as "unclear," *T.L.O.,* 469 U.S. at 354, 105 S.Ct. at 749, and "an unguided "balancing test,' " *id.* at 356, 105 S.Ct. at 750. Justice Stevens was even more harsh in his censure:

> As compared with the relative ease with which teachers can apply the probable-cause standard, the amorphous "reasonableness under all the circumstances" standard freshly coined by the Court today will likely spawn increased litigation and greater uncertainty among teachers and administrators.... I cannot but believe that the same school system faced with interpreting what is permitted under the Court's new "reasonableness" standard would be hopelessly adrift as to when a search may be permissible.

*Id.* at 365, 105 S.Ct. at 755. Several members of the Court thus expressly anticipated that the "reasonableness" standard—particularly in the absence of any clear application to facts—would fail to provide school officials with a systematic way to predict when their conduct might violate the law.

right.

## III. CONCLUSION

We will not engage in polemics regarding the wisdom of the defendants' conduct in this case; suffice it to say that the defendants likely exercised questionable judgment given the circumstances with which they were confronted. Our job, however, is to decide a narrow legal issue in light of our binding circuit precedent: on May 1, 1992, the date on which the relevant conduct at issue in this case occurred, was the law clearly established such that all reasonable teachers standing in the defendants' place reasonably should have known that the search to locate allegedly stolen money violated Jenkins' and McKenzie's Fourth Amendment rights? Applying the principles explicitly stated in *Lassiter,* we conclude that, at the time these events took place, the law pertaining to the application of the Fourth Amendment to the search of students at school had not been developed in a concrete, factually similar context to the extent that educators were on notice that their conduct was constitutionally impermissible. Accordingly, the defendants are entitled to qualified immunity in this case. We AFFIRM.

KRAVITCH, Senior Circuit Judge, dissenting in which HATCHETT, Chief Judge, and BARKETT, Circuit Judge, join:

I fully agree that government officials acting within their discretionary authority should be shielded from liability for violating rights of which a reasonable person would not have known. The majority and I differ only as to whether the schoolhouse Fourth Amendment standard announced by the Supreme Court in *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), would lead a reasonable person to understand that the conduct in this case was prohibited. The majority finds qualified immunity by characterizing the Supreme Court's test as too general to guide any teacher, unless subsequent controlling precedent has applied it to virtually identical facts. In my view, stating that a constitutional test is general or that factually similar precedent is lacking bypasses the fundamental inquiry set out by the Supreme Court: determining whether the governing constitutional standard provides sufficient guidance, given the facts of the case, "that a reasonable official would understand that what he is doing violates [a constitutional] right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Because I believe that

*T.L.O.* sufficiently forewarns teachers that strip searching eight-year-olds in pursuit of a few dollars violates the Fourth Amendment, I respectfully dissent.

Qualified immunity balances the competing concerns present in civil rights suits. Immunity serves the public " "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' " *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (quoting *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)). Taken too far, however, immunity can undermine the purpose of section 1983 altogether, giving officials license to violate the most basic and longstanding constitutional rights. Qualified immunity accommodates these interests by protecting those who act in reasonable reliance upon established legal principles but permitting liability for clearly unconstitutional conduct. Thus, immunity attaches only when official "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

Interpreting the term "clearly established," the Supreme Court has warned courts not to base liability upon expansive legal truisms or to ignore material factual differences between present cases and precedent establishing the asserted constitutional right. In *Anderson,* the Court emphasized that a right is not clearly established unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 640, 107 S.Ct. at 3039.[1] We since have stated that "[g]eneral propositions have little to do with ... qualified immunity." *Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987). Thus, qualified immunity applies where the plaintiff can identify only unworkable abstractions from prior case law and cannot show how those principles would be applied later to different facts.[2] Neither the

---

[1] We have explained that "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law." *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

[2] For example, if the present case had arisen prior to *T.L.O.,* a teacher would have had no reasonable way of knowing when she could search a given student, because the Fourth Amendment had been haphazardly applied to schools. Some courts had held that it permitted searches only upon probable cause, *see State v. Mora,* 330 So.2d 900 (La.), *cert. denied,* 429

Supreme Court nor this court, however, require factual identity between prior and subsequent cases, for that would create absolute immunity.[3]

I review these principles because the majority has taken a rigid approach to their application in the present case. Our various formulations of the "clearly established" test—that prior cases must be factually similar to the case at bar, that general abstractions are unhelpful—represent a shorthand way of saying that the clarity of a constitutional right (and, therefore, official liability) depends upon the interplay of the legal standard and the factual context to which the plaintiff alleges it applies. But it is not enough simply to label pre-existing law "general," or to identify factual distinctions in relevant precedent. Instead, a court must determine whether the generality of a rule casts doubt on its application to the present case or whether factual distinctions from prior precedent are "material," that is, they make the legal rule inapplicable in the later case or suggest that the present conduct is permissible.[4] By contrast, the majority today, declaring *T.L.O.* both general and factually distinguishable, abandons further analysis. This, I believe, is error.

As the Supreme Court recently reaffirmed, the search for specific rules in factually concrete cases should not overshadow the purpose of such a search—determining whether the government actor had fair warning that his/her conduct was unconstitutional. In *United States v. Lanier,* --- U.S. ----, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), the Court unanimously held that: (1) civil rights liability requires only "fair warning" of constitutional rights, --- U.S. at ---- - ----, 117 S.Ct. at 1224-

U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); others had held that school children enjoyed no Fourth Amendment protection, as school officials acted *in loco parentis. See In re Donaldson,* 269 Cal.App.2d 509, 75 Cal.Rptr. 220 (3d Dist.Ct.App.1969).

[3]*See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (citations omitted); *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993) ("The facts [of prior precedent] need not be the same as the facts of the immediate case. But they do need to be materially similar.").

[4]For example, in *Hartsfield v. Lemacks,* 50 F.3d 950 (11th Cir.1995), we rejected a qualified immunity defense in the face of a broad constitutional test. On the facts of that case, we held the police clearly failed to make "reasonable efforts" to avoid erroneous execution of a search warrant, thereby violating the Fourth Amendment.

27;  and (2) neither prior Supreme Court precedent nor factually similar precedent is necessary to provide such warning.  The Court confirmed that decisional law generally, not only from the Supreme Court, can establish a right.  *Id.* at ---- - ----, 117 S.Ct. at 1226-27.[5]  More importantly for present purposes, the Court stressed that rights founded on general statements of law may be enforced against government actors.  It observed that "notable factual distinctions" between prior cases and later ones did not require automatic immunity:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and ... a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful"....

*Id.* at ----, 117 S.Ct. at 1227 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039).  The purpose of factual specificity is to warn government officials when a constitutional test does not, by its own terms, apply to present actions.  Thus, it is necessary only when "an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue...." *Id.*[6]

*Lanier* is consistent both with prior Supreme Court precedent and the policy underlying qualified immunity.  The Court has always required only that the "unlawfulness must be apparent,"

---

[5]I note the tension between the Court's reasoning and the majority's suggestion, ante at ---- n. 2, that only the Supreme Court, Eleventh Circuit, or the highest court of the state can "clearly establish" the law.  *Compare Courson v. McMillian,* 939 F.2d 1479, 1497-98 (11th Cir.1991) (only in-circuit precedent relevant) and *Hansen v. Soldenwagner,* 19 F.3d 573, 578 n. 6 (11th Cir.1994) (same) *with Lanier,* --- U.S. at ---- - ----, 117 S.Ct. at 1226-27 ("Although the Sixth Circuit was concerned ... that disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, such a circumstance may be taken into account in deciding whether the warning is fair enough, without any need for a categorical rule that decisions of the Courts of Appeals and other courts are inadequate as a matter of law to provide it.");  *Elder v. Holloway,* 510 U.S. 510, 515-16, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994) ("A court engaging in review of a qualified immunity judgment should ... use its full knowledge of its own and other relevant precedents.") (internal alterations and quotations omitted) *and Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990) ("we look to the law established by the Supreme Court, the courts of appeals, and the district courts.").

[6]The majority dismisses *Lanier* as irrelevant to the instant case.  I cannot agree.  Although it concedes that "general principles of law can provide clear warning," ante at ---- n. 3 (emphasis omitted), the majority is unwilling to accept *T.L.O.*'s guidance in the absence of its application to "facts materially similar to those of this school search." *Id.* at ----.  Likewise, it reasons that "school officials cannot be required to construe general legal formulations that have not once been applied to a specific set of facts by any binding judicial authority." *Id.* at ---- - ----.  I believe this analysis ignores *Lanier* 's intent and, indeed, the Court's intent throughout its qualified immunity jurisprudence.  *Lanier* and its precursors make liable those who violate established constitutional norms, even ones with a short pedigree in the decisional law.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, so actors "reasonably can anticipate when their conduct may give rise to liability...." *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). Further, excepting all unconstitutional conduct governed by "general" constitutional standards would vitiate the balance struck by *qualified* immunity, as officials in clear violation of broad rules would escape liability.

Thus, we cannot dismiss *T.L.O.* by attaching the appellation "general" to the test it announces or by pointing to the absence of prior factually similar cases. In *T.L.O.,* the Supreme Court noted lower courts' conflicting views regarding the application of the Fourth Amendment to schools, 469 U.S. at 332 n. 2, 105 S.Ct. at 737 n. 2, and squarely addressed the issues before us today: when a search by a school official is authorized, and how intrusive a search the Fourth Amendment tolerates. As the majority recounts, the Court adopted a test born of the *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "reasonableness" standard, but did not leave us with reasonableness alone. It announced a two-pronged test: first, the search must be justified at its inception, that is, "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," 469 U.S. at 342, 105 S.Ct. at 743; and second, the search must be permissible in scope, that is, "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*[7]

This standard obviously can establish the law for certain factual situations. For example, if school rules disallow chewing gum on campus, would the Fourth Amendment permit a strip search by a male teacher of a young girl reasonably suspected of bubblegum possession? Plainly not. *See, e.g., Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1320 (7th Cir.1993) ("A nude search of a student by an administrator or teacher of the opposite sex would obviously violate [the *T.L.O.*] standard. Moreover, a highly intrusive search in response to a minor infraction would similarly not comport with ... *T.L.O.*"). Indeed, as the teachers' counsel conceded at oral argument,

---

[7]Given the case's history and its comprehensive test, I disagree with the conclusion, ante at ----, "that *T.L.O.* did not attempt to establish clearly the contours of a Fourth Amendment right as applied to the wide variety of school settings different from those involved in *T.L.O.*"

certain schoolhouse searches violate the Fourth Amendment as a matter of common sense. Thus, the question before our court, and incompletely answered by the majority, is whether the *T.L.O.* standard suggests "with obvious clarity," *Lanier,* --- U.S. at ----, 117 S.Ct. at 1227, that a strip search of schoolchildren for seven dollars is unconstitutional.

*T.L.O.,* although not crystalline, is—simply on the facts of the case before us—a bright line. Herring and Sirmon lacked even arguable reasonable suspicion to strip search Jenkins and McKenzie.[8] The teachers offer the following evidence as creating reasonable suspicion to search: (1) several students implicated the plaintiffs and they accused one another; (2) McKenzie earlier had gone to the restroom; (3) the money was not found in the backpack or the students' shoes and socks; and (4) historically, other children had been caught with money in their apparel. All of these justifications are specious. First, Herring and Sirmon knew only of Ashley Estell's accusation[9] and the mutual finger-pointing by Jenkins, McKenzie, and Jamerson. Estell's testimony proved untrustworthy when the backpack search revealed nothing, leaving only the students' completely contradictory allegations. This testimony might be at the outer bounds of reasonable suspicion for one search, but it is not so for two.[10] Second, McKenzie's trip to the bathroom, although relevant

---

[8]My discussion is confined to the strip searches. I concede that the initial search of McKenzie's backpack was justified at its inception and reasonable in scope. Ashley Estell's report that Jenkins put the money in McKenzie's backpack gave reasonable suspicion to suspect that searching the backpack would turn up evidence of the theft. *See C.B. By and Through Breeding v. Driscoll,* 82 F.3d 383, 388 (11th Cir.1996). Moreover, the backpack search, performed by the teacher and confined to the place identified as containing the contraband, was not excessive. Further, although the search of the students' shoes and socks may have been questionable, qualified immunity is appropriate, because *T.L.O.* does not clearly prohibit such a search. *See Wynn v. Board of Educ. of Vestavia Hills,* 508 So.2d 1170 (Ala.1987) (search of shoes and socks for $6 justified at inception where two students searched were only ones in room when theft occurred; concluding, without discussion, that search "was not excessively intrusive").

[9]The majority's statement, ante at ----, that "[s]everal students subsequently implicated" the girls is misleading because it does not speak to Herring and Sirmon's knowledge. Fannin testified that two other students, Micquael Scales and Jennifer Simmons, accused Jenkins, but only after Fannin left Herring and Sirmon in the hall with the girls and Jamerson. Fannin did not relate this information until Sirmon returned to the classroom while Herring conducted the first strip search.

[10]Even though Jamerson had implicated himself as the thief (by stating that he hid the money behind a filing cabinet), the teachers conducted a second strip search of the two girls. This was wholly unreasonable, especially in view of the fact that Jenkins stated that she saw Jamerson

to suspicion, was no communicated to Herring or Sirmon prior to the strip search.[11] Third, appellees' suggestion that the lack of evidence in the backpack or the students' shoes and socks permitted the strip search is dubious, as it rests on the questionable premise that more intrusive searches can be predicated upon prior unrevealing searches. *T.L.O.* makes clear that such bootstrapping is impermissible; there, the Court validated the escalating search only because additional evidence continued to emerge. *See* 469 U.S. at 347, 105 S.Ct. at 745-46 (discovery of rolling papers "justified further exploration of T.L.O.'s purse"; evidence of drug dealing justified expansion of search to separate zippered compartment; discovery of "list of people who owe me money" justified reading letters found in zippered compartment). Finally, there is no evidence that Herring or Sirmon knew about prior instances of other students concealing money in their clothing.[12] Thus, because arguable reasonable suspicion was missing, qualified immunity is inappropriate.[13]

---

open the victim's purse, the girls had never stolen anything before, and Jamerson had a history of theft.

[11]There is a conflict in the record on this point, so I presume in favor of the plaintiffs. Herring claimed that Fannin told her of McKenzie's trip and suggested to Herring that money might be hidden in McKenzie's clothes. Herring then allegedly replied that she would take the girls to the bathroom and have them check their clothes. Fannin contradicts this account. Herring claimed the interchange occurred while the girls were putting their shoes and socks back on, but Fannin said she left the hall at that point. Fannin also had no knowledge that Herring might take the girls to the bathroom, but presumed they would go to the office, in accordance with policy. Further, Herring's testimony is unreliable because she changed her story, telling Principal Nelson that Jamerson, not Fannin, informed her that McKenzie went to the bathroom.

[12]Appellees point to clothing searches in other schools, and to searches of shoes and socks allegedly conducted by Nelson, but Herring and Sirmon were unaware of these incidents when they conducted the strip search. Further, it is not clear that, on summary judgment, we can assume that Nelson's searches ever occurred, as the Department of Education's Incident Report found that, in prior school theft incidents, no one had ever been required to remove any article of clothing.

[13]I believe that the majority errs by failing to consider whether there was reasonable suspicion to initiate each of the bathroom searches and by treating the searches as a single search justified at its inception. Ante at ---- n. 4. Each search was separate in time and place and several different people conducted them. For instance, the backpack search was performed solely by Fannin in her classroom, and was not revealed to Herring or Sirmon, who conducted the later bathroom searches.

Further, I differ with the majority's apparent contention that *T.L.O.* requires only a one-time assessment of reasonable suspicion where searches are escalating in nature. *Id.* *T.L.O.* in fact commands a contrary conclusion—it condoned an escalating search only where discovered evidence created suspicion to look elsewhere.

In addition, the scope of the strip search far exceeded what *T.L.O.* allows. To evaluate the scope of a search, *T.L.O.* directs us to consider several factors: whether there was a reasonable relationship between the means by which a student is searched and the objectives for that search; the intrusiveness of the search in light of the student's age and sex; and the intrusiveness of the search in light of the nature of the alleged infraction. Admittedly, age and sex are not particularly instructive in the present case.[14] Nevertheless, this does not render *T.L.O.* unclear for qualified immunity purposes. Our cases confirm that a balancing test may establish the law for a specific set of facts when the "balancing would lead to the inevitable conclusion that the [particular conduct] was unlawful." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989). Because the type of search employed here was not reasonably related to its objectives and was excessive in light of the nature of the infraction, the *T.L.O.* balance inevitably marks Herring and Sirmon's conduct as unconstitutional, thereby clearly establishing the law.[15]

---

[14]Sex is irrelevant because the students were of the same gender as their searchers; however, the suggestion that *T.L.O.* is unclear because it does not explain "whether the search of a boy or girl is more or less reasonable," ante at ----, only confuses the issue. Gender is a concern, obviously, when searches are conducted by members of the opposite sex. As for age, the *T.L.O.* Court did not explain whether older or younger students can be searched more freely. *See Cornfield,* 991 F.2d at 1321 (discussing issue).

> I cannot subscribe to the majority's view, ante at ---- n. 4, that this search was reasonable in scope because eight-year-olds are prepubescent and frequently require assistance in the bathroom. Physical maturity is an elusive and, in my view, unworkable constitutional standard and is by no means the only consideration relevant to intrusiveness. *See generally* Steven F. Shatz et al., *The Strip Search of Children and the Fourth Amendment,* 26 U.S.F.L. REV. 1 (1991) (child's ability to consent, propensity to commit crime, and degree of body autonomy determine intrusiveness). Moreover, there is nothing in this record to support the majority's factual premises, and pediatric literature suggests that they are questionable. *See* Marcia E. Herman-Giddens et al., *Secondary Sexual Characteristics and Menses in Young Girls Seen in Office Practice: A Study from the Pediatric Research Office Settings Network,* 99 PEDIATRICS 505 (1997) (noting that girls often develop pubertal characteristics by age 8, depending on racial and ethnic background); Sally Squires, *Bed-Wetting a Common Inconvenience,* WASH. POST, Apr. 8, 1997, at Z17 ("Most children are toilet-trained sufficiently to stay dry during the day by age 3 or 4....").

[15]The majority notes that Justice Stevens objected to *T.L.O.*'s lack of clarity, ante at ---- n. 5; he also realized, however, that its test would lead to some inescapable conclusions: "One thing is *clear under any standard*—the shocking strip searches that are described in some cases have no place in the schoolhouse. To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." 469 U.S. at 382 n. 25, 105 S.Ct. at 764 n. 25 (Stevens, J., concurring in part and dissenting in part)

The strip searches were not reasonably related to their objectives because they were excessively intrusive and unlikely to turn up evidence, and because other reasonable, minimally intrusive options were available.

> It is axiomatic that a strip search represents a serious intrusion upon personal rights. In *Mary Beth G.* [*v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) ], the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."

*Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir.1992).[16] Thus, for a strip search to be reasonably related in scope to the objectives for which it was undertaken, the objectives must be weighty,[17] and the search must be necessary to locate the suspected evidence. *See Terry,* 392 U.S. at 29-30, 88 S.Ct. at 1883-85 (search must be "confined in scope to an intrusion reasonably designed to discover" items sought and "confined ... strictly to what was minimally necessary" to locate those items). Here, acting only on the discredited testimony of one student and the contradictory allegations of the three suspects (exacerbated by threats that the police would be called to investigate), the teachers launched a full-scale strip search of two eight-year-olds, foregoing several reasonable, yet minimally intrusive, intermediate steps.

Fannin never questioned whether the money was truly stolen. She did not inquire whether the money might have been spent or misplaced, nor did she ask how Estell knew that Jenkins took the money. Fannin also did not search Jenkins's bag. Further, Herring took over the situation without asking any questions, and promptly ordered a search of the students' shoes and socks, followed by a strip search, even though there was absolutely no evidence that the girls might have

---

(emphasis added) (citations omitted).

[16]Although decided after the events at issue in the present case, *Justice* 's treatment of strip searches merely confirms their self-evidently intrusive character.

[17]*See Cornfield,* 991 F.2d at 1321 ("[A]s the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search."). A sliding scale of reasonableness is inherent in the Fourth Amendment. *Terry,* for example, teaches that "[t]he scope of the search must be "strictly tied to and justified by' the circumstances which rendered its initiation permissible." 392 U.S. at 19, 88 S.Ct. at 1878. *See also, e.g., United States v. McMurray,* 747 F.2d 1417, 1420 (11th Cir.1984) (in customs context, as intrusiveness increases, suspicion necessary to justify search must increase).

the money in their underclothing.  Thus, because there was not even reasonable suspicion to believe that the girls possessed contraband, because the teachers ignored less intrusive means, and because the personal invasion was extreme, the first strip search was necessarily disproportionate to its justification.  The second strip search was even more blatantly unconstitutional, as no one could reasonably argue that it was necessary after the fruitless prior search.

Finally, the nature of the infraction here—a small theft—is insufficient as a matter of law to permit a strip search.  *T.L.O.* directs us to consider the nature of the infraction because, although keeping order in the school is important, it is not determinative.  Students' privacy rights must be weighed in the balance.  Strip searching a student is permissible only in extraordinary cases, and only to prevent imminent harm.[18]  For example, if school administrators have reasonable suspicion that a student is carrying a gun on his/her person and a "pat-down" confirms this suspicion, a strip search by an administrator of the same sex, strictly limited to finding the weapon, would be permissible.  The theft of $7, although morally reprehensible, poses no threat of physical danger to other students and cannot, therefore, serve as the basis for a search of this magnitude.[19]

As the Seventh Circuit, faced with a qualified immunity defense following a school strip search, explained:

> It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude.  More than that:  it is a violation of any known principle of human decency.  Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law."

*Doe v. Renfrow,* 631 F.2d 91, 92-93 (7th Cir.1980) (citation omitted), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).  Because Herring and Sirmon flagrantly ignored common

---

[18]*See Justice,* 961 F.2d at 193 (collecting cases;  noting that threat of harm was only permissible reason in case law for strip search of arrestee).

[19]*See, e.g., Oliver by Hines v. McClung,* 919 F.Supp. 1206, 1216-19 (N.D.Ind.1995) (strip search of seventh graders for $4.50 unconstitutionally unreasonable); *State ex rel. Galford v. Mark Anthony B.,* 189 W.Va. 538, 433 S.E.2d 41, 49 (1993) (strip search for $100 unconstitutionally unreasonable in scope because no threat of danger); *Bellnier v. Lund,* 438 F.Supp. 47, 53-54 (N.D.N.Y.1977) (strip search for stolen $3 unconstitutionally unreasonable, given unparticularized suspicion and "relatively slight danger of the conduct involved").

sense and, crucially, the Constitution, I would reverse the district court's order granting qualified immunity.