Tiffany THOMAS, a minor by her father Gregory THOMAS, Carl G. Casey, a minor by his mother Virgil M. Casey, et al., Plaintiffs-Appellants,

v.

R.G. ROBERTS, individually and in her official capacity as Assistant Principal, West Clayton Elementary School, Zannie Billingslea, et al., Defendants-Appellees.

No. 00-11361.

United States Court of Appeals,

Eleventh Circuit.

Aug. 15, 2001.

Appeal from the United States District Court for the Northern District of Georgia. (No. 97-01517-CV-JEC-1), Julie E. Carnes, Judge.

Before BLACK, RONEY and COX, Circuit Judges.

COX, Circuit Judge:

The appellants, thirteen schoolchildren in Clayton County, Georgia, sued their teacher Tracey Morgan, Officer Zannie Billingslea of the Clayton County Police, their school's assistant principal R.G. Roberts, the school's principal Ralph Matthews, the Clayton County School District, and the County, alleging that they were subject to unconstitutional strip searches. The district court found that the strip searches[1] were unconstitutional but granted summary judgment to all defendants on all claims, concluding that the individual defendants were entitled to qualified immunity and the improper searches were not a product of School District or County policy. We affirm.[2]

*Background*[3]

On the morning of October 31, 1996, fifth-grader Sergio Evans brought to West Clayton Elementary School an envelope containing twenty-six dollars he had raised selling candy for a school trip. Sergio proceeded to the classroom of his teacher, defendant Tracey Morgan, and laid the envelope on a table near

---

[1]Even though the students do not contend that they were required to remove all of their clothes, we will use the phrase "strip search" for convenience to refer to all of the searches during which the children were required to remove items of clothing.

[2]Principal Matthews has been dismissed as an appellee by agreement of counsel. We therefore will not address the district court's grant of summary judgment on the claims against him.

[3]The facts are presented in the light most favorable to the plaintiffs. The defendants vigorously dispute many of the students' allegations, including the extent of the searches, whether some students were searched absent reasonable suspicion, and whether some students were threatened in order to get them to comply with the search.

her desk. Moments later, Sergio noticed that the envelope was no longer on the table and informed Morgan, who asked the class if anyone had seen the money. None of the children in the class indicated that they knew what had happened to the envelope. Sergio searched his belongings, but failed to find the money. Morgan, who oversaw a class filled with children who were too poor to afford their school lunches, testified that she felt that the missing money presented a serious situation.

At this point, defendant Officer Zannie Billingslea of the Clayton County Police Department arrived to teach a class in drug awareness for the Drug Abuse Resistance Education ("DARE") program. Morgan left the class in Billingslea's hands, carrying out the room's trash cans to search through them for the envelope. After unsuccessfully attempting to contact Sergio's mother to see if Sergio had forgotten to bring the envelope to school, Morgan took the trash cans to the school's workroom. There Morgan met the school's assistant principal, defendant R.G. Roberts, and a school paraprofessional. Because the school's principal was not in the building at the time, Roberts was serving as acting principal.

Morgan informed Roberts that money was missing from her classroom and asked that she be allowed to conduct a search to find it. Roberts authorized a search, although her exact response is in dispute. Roberts maintains that she gave Morgan very specific limits, authorizing only a search of the girls' purses and the boys' pockets. Morgan testified that Roberts placed no specific limits on the search and simply approved a search, stating that "no child should have that amount of money on them." (Pls. Ex. Morgan Dep. at 60). Two students testified that they heard Morgan tell Billingslea that Roberts had authorized her to "strip search" the children.[4] Roberts and Morgan also disagree as to whether Roberts authorized Morgan to use Billingslea in the search.

After speaking with Roberts, Morgan returned to her classroom and began to search for the envelope. Billingslea remained in the room. Morgan searched the students' book bags, desks, and purses. She then asked the students to remove their shoes, so she could determine if they had secreted the envelope in their socks. Finally, Morgan told the children to turn out their front pockets and allow her to pat down their back pockets. Morgan did not find the missing envelope; nor did the results of the search point to any individual student as a potential suspect. At this point, Morgan allowed three students who had been scheduled to hand out DARE ribbons to a third-grade class to leave the classroom. These students, despite being present when the envelope disappeared, were subject to no further investigation.

---

[4]The district court disregarded this testimony, concluding that it was inadmissable hearsay.

Morgan informed Billingslea, who had observed her efforts from the back of the room, that she had not found the envelope. Billingslea told Morgan that it had become fashionable for children, especially boys, to wear two or more pairs of pants and the envelope might be secreted in a lower layer. Morgan broke up the boys into groups of four and five and sent them group by group to the boys' restroom with Billingslea. Several of the boys testified that, once in the restroom, Billingslea pulled his pants and underwear down to his ankles to demonstrate what the children were required to do. Billingslea also informed the boys that if they didn't pull down their pants as directed, they would be suspended from school or taken to jail. All of the boys dropped their pants, and some of them dropped both their pants and underwear. One student testified that two girls from his neighborhood saw him drop his pants through the restroom's open door. As each student dropped his pants, Billingslea visually inspected the boy's underwear to ensure that the envelope was not inside.

While Billingslea was searching the boys, Lester Lenard Grace, a student in another fifth grade class, entered the restroom. Billingslea called Lenard over and asked him about the missing money. Lenard protested that he knew nothing about the money and wasn't even a member of Morgan's class. Billingslea told Lenard to pull out his pants pockets and loosen his belt. Billingslea then shook Lenard's pants to see if the envelope was secreted inside. When nothing fell out of Lenard's pants, Billingslea released him. The envelope was not found in the searches.

Once the boys had returned to the classroom, Morgan told all of the girls to line up in the hallway outside the girls' restroom. She then brought the girls into the restroom in groups of two to five students at a time. The students testified that Morgan made them lower their pants and raise their dresses or shirts. Most of the girls were also asked to lift their brassieres and expose their breasts to ensure that the envelope was not hidden under their bras. Some of the girls testified that Morgan touched them as she searched for the envelope. There is also testimony that Morgan warned the girls that they could be sent to "juvenile" for not complying. Cherika Sales, who first arrived at Morgan's classroom when the girls were lining up to be searched in the restroom, was subjected to the same search as the other girls. Although Cherika had been in another classroom the entire morning, Morgan first searched her personal belongings and then made Cherika pull her pants down and lift her bra above her breasts in the restroom. Again, the envelope was not found. Once the searches were complete, Morgan conducted no further investigation and the rest of the school day proceeded as normal.

The next day, three sets of parents complained to Principal Ralph Matthews and Roberts about the

searches. Matthews assured them that the school would conduct a thorough investigation. Roberts then gathered the children and asked them to write statements describing the events of the previous day. After he read the children's statements, Matthews asked Morgan to give her version of events. The School District thereafter launched an investigation of its own into the matter. After reviewing the students' statements and meeting with Roberts, Matthews, and Morgan, the District's investigator concluded that the students were not "strip searched." The Clayton County Police Department performed its own investigation of Billingslea's conduct, which resulted in the issuance of a letter of reprimand against Billingslea and a reduction in his pay increase.[5]

The students filed suit in the Northern District of Georgia on May 27, 1997. Their amended complaint alleges several claims. First, the complaint alleges that Morgan, Roberts, Matthews, Billingslea, the District, and the County deprived the students "of their rights to privacy, to be secure in their persons and to be free from unreasonable searches and seizures as protected by the First, Fourth, Fifth, Ninth and Fourteenth Amendments...." (R.2-52 at 21.) The complaint also alleges that the defendants deprived the students of their rights to due process as protected by the Fourteenth Amendment. Finally, the complaint alleges violations of the Georgia constitution and Georgia statutes. The complaint seeks compensatory and punitive damages as well as declaratory and injunctive relief.

The defendants moved for summary judgment, which the district court granted in a comprehensive ninety-one page order. First, the district court determined that the Fourth Amendment unreasonable search and seizure claim made applicable through the Fourteenth Amendment was the only viable federal claim. The district court accordingly dismissed the other federal claims and applied Fourth Amendment standards to the students' claims.[6] The district court proceeded to find that: (1) the strip searches were unconstitutional; (2) despite the unconstitutional nature of the searches, the individual defendants were entitled to qualified immunity; (3) the District was not liable for the actions of Morgan, Roberts, or Billingslea; (4) the County was not liable for the actions of Billingslea; and (5) the students' state law claims should be dismissed without prejudice. The students filed a motion to reopen the case to determine whether they were entitled

---

[5]The police investigators concluded that Billingslea had: (1) acted without probable cause in conducting the searches; (2) failed to obey known caselaw on school searches; (3) violated the department's policies on school searches; (4) acted unprofessionally in lowering his pants in front of students in the boys' restroom; and (5) improperly used threatening tactics to force the children to pull their pants down.

[6]The students do not question the dismissal of their other constitutional claims.

to injunctive and declarative relief. Upon review, the district court denied the requested relief. This appeal followed.

## Issues on Appeal

The students contend on appeal that the district court erred in: (1) determining that the individual defendants were protected by qualified immunity; (2) concluding that the District and the County could not be held liable for the searches; and (3) denying injunctive and declaratory relief. We review a district court's grant of summary judgment de novo, drawing all reasonable inferences from the record in favor of the nonmoving party. *See Korman v. HBC Florida, Inc.,* 182 F.3d 1291, 1293 (11th Cir.1999). A district court's grant or denial of equitable relief is subject to review for abuse of discretion. *See Kidder, Peabody & Co. v. Brandt,* 131 F.3d 1001, 1003 (11th Cir.1997).

## Discussion

We will begin our discussion by considering the constitutionality of the searches and then proceed to each issue raised by the students in turn. *See County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998) (courts are obligated to determine whether a plaintiff has alleged a constitutional deprivation before proceeding to address whether an individual government actor is entitled to qualified immunity).

The constitutional standard for assessing the legality of searches undertaken by school officials was first established by the Supreme Court in *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In *T.L.O.,* a high school vice principal searched the purse of a student who had been caught smoking in violation of a school rule. *See T.L.O.,* 469 U.S. at 328, 105 S.Ct. at 736. Upon opening the purse, the vice principal found a pack of cigarettes. *See id.* He also noticed a package of cigarette rolling papers in the purse, which he knew high school students often used to smoke marijuana. *See id.* Further searching revealed a small amount of marijuana, a pipe, a large quantity of dollar bills, an index card which apparently listed those students who owed her money for drugs, and two letters that further implicated her in drug dealing. *See id.* The vice principal turned the evidence over to the police. *See id.* In a subsequent delinquency proceeding, the student moved to suppress the evidence found in her purse, arguing that the search violated the Fourth Amendment. *See id.* at 329, 105 S.Ct. at 736.

In reviewing the constitutionality of the search, the Supreme Court first determined that the Fourth Amendment applies to searches of schoolchildren conducted by school officials. *See id.* at 333, 105 S.Ct.

at 738. The Court then noted that the standard of reasonableness governing a class of searches must be determined by " 'balancing the need to search against the invasion which the search entails.' " *See id.* at 337, 105 S.Ct. at 740 (quoting *Camara v. Mun. Ct.,* 387 U.S. 523, 536-37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). After weighing students' legitimate expectations of privacy against school officials' need to maintain a proper educational environment, the Court concluded that it would be improper to "require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law." *Id.* at 341, 105 S.Ct. at 742. Instead, the Court held that the "legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.*

The *T.L.O.* Court established a two-pronged test to determine whether a search by school officials is reasonable. First, a court must consider whether the search was justified at its inception. *See id.* at 341, 105 S.Ct. at 742-43. A search will be justified at its inception if the school official has "reasonable grounds for suspecting that the search will turn up evidence the student has violated or is violating either the law or the rules of the school." *Id.* at 341-42, 105 S.Ct. at 743. Second, the court must determine whether the scope of the search was reasonably related to the " 'circumstances which justified the interference....' " *Id.* at 341, 105 S.Ct. at 743 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The scope of a search will be permissible "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743.

This court has yet to apply the *T.L.O.* standard to situations in which school officials require students to remove some of their clothing during a search.[7] We have little trouble in concluding, however, that the strip searches in this case were unconstitutional. As noted above, the *T.L.O.* Court held that a school official must have "reasonable grounds" for suspecting that a student is guilty of a violation of school rules or the law.

---

[7]We were faced with searches similar to those in this case in 1997's *Jenkins v. Talladega City Bd. of Educ. See* 115 F.3d 821 (11th Cir.1997) (en banc). The plaintiffs in *Jenkins* were two eight-year-old girls who other students had accused of taking seven dollars from a fellow classmate. *See id.* at 822. Based on these accusations, the students' teacher and a guidance counselor took the girls to a restroom where they were required to remove all of their clothes. *See id.* The money was not found. *See id.* After further investigation failed to turn up the missing money, the girls were again required to remove their clothes. *See id.* at 823. The girls' parents filed an 42 U.S.C. § 1983 action alleging, inter alia, that the searches violated the Fourth Amendment. *See id.* On appeal from the district court's grant of summary judgment, we addressed only the issue of whether the individual defendants should have been granted qualified immunity and did not reach the broader question of whether the searches were unconstitutional. *See id.*

*Id.* at 341-42, 105 S.Ct. at 743. While declining to decide if individualized suspicion was a necessary element of the reasonableness standard in school searches, the Court noted that the requirement that officials possess suspicion that a particular student committed an illicit act before searching the student is subject to a very limited exception. *See id.* at 342 n. 8, 105 S.Ct. at 743 n. 8.

Given the circumstances of the money's disappearance, Morgan reasonably suspected that a student in her class had taken the envelope. However, Morgan and Billingslea did not possess individualized suspicion that pointed to a specific student or group of students as responsible. In order to determine whether the searches were justified in their inception, we must therefore first ask whether the searches were justified absent individualized suspicion.

The Supreme Court has held that a search may be conducted without individualized suspicion when "the privacy interests implicated by the search are minimal, and ... an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Skinner v. Ry. Labor Executives' Ass'n.,* 489 U.S. 602, 624, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989). The Court recently applied this test to school searches in *Vernonia Sch. Dist. 47J v. Acton.,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). The petitioner school district in *Vernonia* had noticed a trend of drastically increasing drug use by high school students. *See id.* at 648, 115 S.Ct. at 2388. Especially disturbing to school officials was that student athletes were in the vanguard of the burgeoning drug scene. *See id* at 649, 115 S.Ct. at 2388-89. The rise in drug use had fueled what the district court deemed a " 'state of rebellion' " among the student body with a three-fold increase in classroom disruptions. *Id.* at 649, 115 S.Ct. at 2389 (quoting *Acton v. Vernonia Sch. Dist. 47J,* 796 F.Supp. 1354, 1357 (D.Or.1992)).

One of the school district's responses to this situation was to establish a mandatory drug testing program for all athletes that required the students to provide urine samples. *See id.* at 650, 115 S.Ct. at 2389. The plaintiff in *Vernonia* was a seventh grader who wanted to play football but refused to consent to the drug testing regime. *See id.* at 652, 115 S.Ct. at 2390. Once the student was denied participation, he and his parents sued the school district, seeking declaratory and injunctive relief on the grounds that the drug tests were unreasonable searches. *See id.* at 651, 115 S.Ct. at 2390.

The *Vernonia* Court first noted that the search conducted in *T.L.O.,* while not supported by probable cause, "*was* based on individualized *suspicion* of wrongdoing." *Id.* at 653, 115 S.Ct. at 2391 (emphasis in original). Because the searches in *Vernonia,* like the searches in the instant case, were not supported by

individualized suspicion, the Court proceeded to determine if the urine tests fit into the limited exception to the Fourth Amendment's requirement of individualized suspicion. *See id.* In applying the *Skinner* balancing test, the Court first determined that student athletes had a reduced expectation of privacy because: (1) high school students generally have lesser expectations of privacy than adult members of the public; and (2) athletes, who "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally," have concomitantly lower expectations of privacy. *Id.* at 656-657, 115 S.Ct. at 2392-93. The Court thereafter concluded that the character of the intrusion caused by the tests was insignificant because students were permitted to provide the samples without invasive monitoring and the tests revealed a limited amount of information. *See id.* at 658-60, 115 S.Ct. at 2393-94.

Finding the privacy interests and the intrusion implicated by the drug tests to be minimal, the *Vernonia* Court then balanced the interests of the athletes against the school district's interest in avoiding widespread drug use by high school students. In contrast to the minor privacy interests implicated by the drug tests, the Court concluded that: (1) the school district's interest in curbing drug use by its athletes was important, if not compelling; (2) the threat posed by the drug crisis to the functioning of the high school was immediate; and (3) the drug tests were effective because they were limited to athletes, who were both the leaders of the drug scene and also subject to increased health risks from drug abuse. *See id.* at 662-63, 115 S.Ct. at 2395-96. The Court therefore concluded that the drug tests were justified absent individualized suspicion. *See id.* at 664-65, 115 S.Ct. at 2396.

Applying the *Skinner* balancing test to all but one of the searches conducted here, however, leads to a different result. Students in the school environment have lesser expectations of privacy than members of the general public. *See T.L.O.,* 469 U.S. at 348, 105 S.Ct. at 746 (Powell, J. concurring). However, there is no question that schoolchildren retain a legitimate expectation of privacy in their persons, including an expectation that one should be able to avoid the unwanted exposure of one's body, especially one's "private parts." *See Justice v. City of Peachtree City,* 961 F.2d 188, 191 (11th Cir.1992). Although students may surrender some expectations of privacy when they enter the schoolhouse door, an expectation that they will be free from forced strip searches is not one of them. We therefore conclude that the students had an important privacy interest in not being unclothed involuntarily.

Turning to the nature of the searches, it is readily apparent that the strip searches were highly intrusive. All of the children except Lenard Grace were required to drop their pants or lift their skirts to

reveal their underwear.[8]  Some of the boys lowered both their pants and underwear.  Most of the girls were also required to lift their bras and reveal their breasts to their teacher and other children.  The searches in this case therefore clearly represented a "serious intrusion upon [the students'] personal rights."  *Id.* at 192. Because of the important privacy interest at stake and the intrusive nature of the searches, school officials must have possessed a truly important interest that would have otherwise been endangered in order to justify Morgan and Billingslea's actions.

It is axiomatic that school officials have a substantial interest in maintaining order and discipline in their classrooms.  A student's theft of another student's money, while possibly a petty offense outside of the classroom, could seriously impact a teacher's ability to maintain a safe and effective learning environment. School officials also have a significant interest in assuring that children do not receive the message that stealing is acceptable behavior.  However, there is no reason to believe that the government's interests in maintaining classroom discipline and promoting moral development would have been jeopardized if Morgan and Billingslea were required to possess individualized suspicion before forcing the children to remove their clothing.  *See Skinner,* 489 U.S. at 624, 109 S.Ct. at 1417.

This case is unlike *Vernonia,* in which a school district was faced with a seemingly intractable problem of students using dangerous narcotics in and around school.  Nor is this a case where, for example, school officials receive information that an unidentified student may be carrying a weapon or other dangerous article on school property, therefore requiring a generalized search to avoid an immediate threat of physical harm to students, faculty, or staff.  There has simply been no showing here that important government interests were in such jeopardy that an intrusive mass search was permissible.  We therefore conclude that the alleged theft of twenty-six dollars, while certainly not insignificant in the context of a grade school, does not present such an extreme threat to school discipline or safety that children may be subject to intrusive strip searches without individualized suspicion.  Because the strip searches in this case were conducted without individualized suspicion, they were not justified at their inception and were thus unreasonable under the Fourth Amendment.

We now turn to the constitutionality of the limited search of Lenard Grace.  As noted above, Lenard was a student in another fifth grade class who happened to need to use the restroom as Billingslea was searching the boys.  Lenard testified that he told Billingslea that he wasn't a member of Morgan's class and

---

[8]We address the question of the constitutionality of the less invasive search of Lenard Grace infra.

knew nothing about the missing envelope. Billingslea required Lenard to pull out his pants pockets and loosen his belt; he then shook Lenard's pants. After he failed to locate the envelope, Billingslea let Lenard return to his class. Lenard was not required to remove any of his clothing. We conclude that Billingslea's cursory search of Lenard was reasonable, given the information available to Billingslea at the time.

We have already concluded that Billingslea possessed some reasonable suspicion that one of the children in Morgan's classroom possessed the envelope. Billingslea has testified that he recognized Lenard's name, but couldn't remember what he looked like. Given that Billingslea had no idea who Lenard was when Lenard entered the restroom, it would not have been unreasonable of Billingslea to conclude that Lenard was a member of Morgan's class who had been sent in to be searched. Even if we assume that a reasonable officer would have taken Lenard's protestations at face value and concluded that Lenard wasn't a member of Morgan's class, Lenard's appearance in the midst of the boys from Morgan's class could still have reasonably suggested that he may have had the opportunity to somehow acquire the envelope. Accordingly, it was not unreasonable of Billingslea to conclude that Lenard may have had the envelope.

However, as with the students in Morgan's classroom, Billingslea did not possess suspicion that pointed to Lenard as a suspect. We thus must again apply the *Skinner* balancing test to determine whether it was appropriate to search Lenard without individualized suspicion. First, it is clear that Lenard had a legitimate privacy interest in the contents of his pockets and pants. *See T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 741. Unlike the other children, however, Lenard was subjected to a far less intrusive search; he was required only to pull out his pockets and allow Billingslea to shake his pants. We conclude that, given the important government interests at stake and the cursory nature of the search, the *Skinner* balancing test tips in favor of the government. Therefore, Billingslea's search of Lenard was justified absent individualized suspicion.

Since we have determined that the search of Lenard was justified in its inception, the only question now remaining is whether "the measures adopted [were] reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743. We conclude that the measures undertaken were both reasonably related to the goals of the search and not excessively intrusive. Billingslea limited his search to areas where Lenard could have secreted the envelope and did not subject Lenard to the intrusive and embarrassing strip search the remaining children had to endure. Because Billingslea had at least *some* suspicion that Lenard may have had the envelope and

conducted only a cursory search of Lenard's person, we conclude that Billingslea's search of Lenard was reasonable under the Fourth Amendment.

## *Qualified Immunity*

We turn now to the question of whether the district court erred in granting Morgan, Roberts, and Billingslea summary judgment based on qualified immunity. Qualified immunity provides complete protection for government officials sued in their individual capacities as long as "their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In order for the law to be "clearly established," it must have been developed at the time of the alleged violation "in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The pre-existing law must "truly compel (not just suggest or allow or raise a question about)" the conclusion that "what defendant is doing violates federal law *in the circumstances*." *Id.* at 1150 (emphasis in original). Law can be clearly established in this circuit only by decisions of the U.S. Supreme Court, this court, or the highest court of the state from which the case arose. *See Hamilton v. Cannon,* 80 F.3d 1525, 1532 n. 7 (11th Cir.1996).

The district court concluded that Morgan, Roberts, and Billingslea were entitled to qualified immunity because it was not clearly established at the time of the searches that strip searching the children en masse was unconstitutional. On appeal, the students contend that the law was sufficiently established on the day of the searches that a reasonable government official would have been aware that the searches were unconstitutional. We review a district court's determination that an official is entitled to qualified immunity de novo. *See Pickens v. Hollowell,* 59 F.3d 1203, 1205 (11th Cir.1995). In support of their argument that qualified immunity was improperly granted, the students rely mainly on *T.L.O.,* arguing that it, and the cases from other circuits cited within the *T.L.O.* opinion, made it clear that school officials may not search students absent particularized suspicion.

As noted above, however, the *T.L.O.* Court expressly refrained from addressing the issue of whether individualized suspicion is required for a school search to be reasonable. *See T.L.O.,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. Instead, the Court established a two-pronged, multi-factored test balancing the student's

interest against those of school officials. The *T.L.O.* opinion offered "no illustration, indication, or hint as to *how* the enumerated factors might come into play when other concrete circumstances are faced by school personnel." *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 825 (11th Cir.1997) (en banc) (emphasis in original). The *T.L.O.* Court simply made no "attempt to establish clearly the contours of a Fourth Amendment right as applied to the wide variety of possible school settings different from" that presented by the facts of the case. *Id.* at 828. The Supreme Court's later opinion in *Vernonia* clarified the situation only as far as holding that school officials, in certain situations, may search students without individualized suspicion.

It is thus difficult to imagine how school officials reading *T.L.O.* or *Vernonia* would have found themselves compelled to conclude that the searches in this case were constitutionally impermissible. Although a reasonable school official might have paused before strip searching a class of fifth graders, the best she could have discovered from a reading of the available caselaw was that a court may later determine that the searches were unreasonable. We conclude that the law was not developed in such a factually defined context that the individual defendants should have been aware that they were acting illegally when they either ordered or performed the searches in question.[9] The district court therefore did not err in granting Morgan,

[9]As noted *supra,* officials sued in their individual capacities under § 1983 are generally entitled to qualified immunity unless a factually similar and controlling case has clearly established that the conduct is impermissible. *See Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994). We have, however, recognized a "narrow exception" to that rule in a few cases. *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000). In order for the narrow exception to apply, a plaintiff must show that "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997). The conduct must be "so far beyond the hazy border" between a reasonable and unreasonable search that the officials had to know they were violating the Constitution. *Id.*

The search of one of the students, Cherika Sales, occurred under slightly different circumstances. Cherika testified that she had been in another classroom the entire morning. She first arrived at Morgan's classroom as Morgan was lining the girls up in the hallway to be searched in the restroom. Apparently concluding that she should treat Cherika the same way she treated the other members of the class (a tactic that teachers often reasonably apply in disciplinary matters), Morgan immediately took Cherika into the restroom and searched her, requiring her to lower her pants and lift her bra over her breasts. Viewing the evidence in the light most favorable to Cherika, we conclude that Morgan had no reason to suspect that Cherika had the envelope in her possession. Although her decision to search Cherika was unconstitutional, we cannot conclude that Morgan should be held liable absent factually similar and controlling caselaw. The exception established in *Smith* is very narrow, applying only when the conduct in question is so egregious that the government actor must be aware that she is acting illegally. *See, e.g., Priester,* 208 F.3d at 927 (denying qualified immunity on basis of narrow exception in excessive force case where defendant police officer "ordered and allowed his dog to attack and bite Plaintiff; threatened to kill Plaintiff when Plaintiff kicked the dog in an effort to resist the unprovoked attack; and let the dog attack Plaintiff for at least two minutes"); *Smith,* 127 F.3d at 1419-20

Billingslea and Roberts qualified immunity.

*School District Liability*

The students rely on three alternative theories to hold the District liable for the actions of Morgan and Billingslea. First, they contend that Roberts acted as a "final policymaker" for the District when she permitted Morgan to search the children. Second, the students argue that the District should be held responsible because it failed to adequately train its employees on the constitutional limits of student searches. Finally, the students maintain that the District should be held accountable because it ratified the unconstitutional searches. We will address each argument in turn.

Local governments can only be held liable for constitutional torts when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" caused the injury. *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). Liability may be imposed for a single decision made by a government official, provided that the official " 'possesses final authority to establish ... policy with respect to the action ordered.' " *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir.1997) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)). Whether an official is a final policymaker is a question of state law to be determined by the trial court. *See Owens v. Fulton County,* 877 F.2d 947, 950-51 (11th Cir.1989). The students contend that Roberts, who was the top administrator present at the school at the time of the search, was the District's final policymaker on the issue of whether the children could be strip searched.[10]

The District's policy on searching students provides, in part, that the District retains "a limited right to search students' personal belongings...." (Pls.' Sch. Exs. at Ex. 1). The District's Student and Parent Handbook further provides that "administrators ... posses the authority to conduct a reasonable search of students and their possessions ... [and are] required to have only reasonable suspicion to conduct such searches." (Def. Clayton County Sch. Dist's Mot. for Summ. J. at Bass and Warren Affs. at Ex. 1). It is also

---

(declaring that conduct "barely" qualified for narrow exception where police officer broke the arm of an allegedly docile arrestee who had admittedly previously been fleeing). Because Morgan's actions were not so far beyond the boundary established in *T.L.O.* that she must have been aware that searching Cherika was impermissible, the district court did not err in granting her qualified immunity on Cherika's claims.

[10]In this discussion, we will assume that, as the students' contend, Roberts explicitly authorized Morgan to strip search the children.

beyond dispute that Roberts, as the top administrator in the school, was vested with the power to order the children to be searched. Looking at this evidence together, we conclude, as did the district court, that the District had a policy of permitting searches based upon reasonable suspicion and Roberts had the authority to order searches within the District's policy limits. Although Roberts was provided with the discretion to order searches within the school, she had no authority to alter the District's explicit policy that searches could not be conducted absent reasonable suspicion. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481-82, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (fact that official has discretion in the exercise of particular functions does not automatically give rise to municipal liability based on exercise of that discretion).

The students suggest that Roberts' untrammeled and unreviewable authority to conduct searches within the school strongly suggests that she was a final decisionmaker. We have previously noted that a lack of meaningful review of an official's decisions can be evidence that she was a final policymaker. *See Mandel v. Doe,* 888 F.2d 783, 794 (11th Cir.1989) (physician's assistant at county workcamp whose decisions were not subject to review was final decisionmaker on medical issues). In this case, however, it is irrelevant that Roberts's decision was not subject to review because it was contrary to the District's official written policy. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion). When an official's exercise of her discretionary duties is "constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the [local government]." *Id.* Roberts's decision to search the children without reasonable suspicion therefore cannot be said to fairly represent the District's policy.

We also reject the students' contention that the District should be held liable based on its failure to train its employees. There are "limited circumstances" in which a local government will be held liable because it inadequately trained or supervised its employees, who then infringed upon a plaintiff's constitutional rights. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998) (quoting *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989)). To be successful, a plaintiff must demonstrate that: (1) the government inadequately trained or supervised its employees; (2) the failure to train is an official policy; and (3) the policy caused the employees to violate the plaintiff's rights. *See id.* A plaintiff may prove that a policy existed by showing that the government knew that a need to train or supervise its employees existed but made a "deliberate choice not to take any action." *Id.* A need for training and/or supervision will be proven when there is sufficient evidence that: (1) the government's employees

"face clear constitutional duties in recurrent situations"; or (2) "a pattern of constitutional violations exists such that the [government] knows or should know that corrective measures are needed." *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1172 (11th Cir.1995).

The students argue that the record supports the conclusion that a need for training was evident based upon both theories. We agree with the district court, however, that the students have failed to present sufficient evidence to demonstrate either that the District's employees faced clear questions of Fourth Amendment law on a recurring basis or that there was a pattern of unconstitutional searches and seizures being perpetrated by school administrators of which the District was, or should have been, aware.

The students have presented evidence that searches have occurred in the District's schools and that school personnel were involved in a majority of the searches conducted during the period immediately prior to the events at issue here.[11] However, the students have failed to demonstrate that District personnel are recurrently faced with situations which are so similar to the facts of the instant case that the need for training would be obvious. In fact, the record is bereft of evidence as to whether District officials ever conducted a search of this magnitude before the events of the instant case. We therefore conclude that there is insufficient evidence to show that the likelihood of "constitutional violations was highly predictable so that liability attaches for this single incident." *Gold,* 151 F.3d at 1352.

We also agree with the district court that the students have failed to present evidence of a pattern of unconstitutional behavior that should have led the District to begin training its employees. Again, the record reflects that multiple searches had occurred at District schools. Proving that searches occurred, however, does not meet the students' burden. *See id.* at 1351. They must also show that the searches conducted by school personnel were constitutionally suspect. *See id.* This, they have failed to do. The evidence presented by the students lacks the detail necessary for a court to determine whether any of the searches were, if not unconstitutional, at least suspect. Because the students failed to present sufficient evidence to support their claim that the District was on notice of a need to train or supervise its employees, the district court did not

---

[11]The competent evidence presented by the students to support their claim that unconstitutional searches conducted by District employees were widespread consists of: (1) a list of disciplinary incidents at District schools during 1995 which includes a description of each incident and the punishments meted out to the students involved but does not include information as to whether the students were searched; (2) the deposition testimony of Principal Matthews in which he acknowledged that he had searched students and authorized searches by others; (3) Roberts's deposition testimony that she had also been involved in student searches; (4) an affidavit of an ACLU law clerk describing her review of the searches conducted in the District's schools from the period of January 1995 to October 1996 which fails to provide sufficient detail that would permit a court to determine if any were constitutionally suspect.

err in granting the District summary judgment on the failure to train claim.

The students' argument that the District should be held liable because its investigation following the searches was tantamount to a ratification of the conduct is similarly without merit. The students rely on the Supreme Court plurality opinion in *City of St. Louis v. Praprotnik* for the proposition that liability can attach when a local government policymaker "approve[s] a subordinate's decision and the basis for it." 485 U.S. at 127, 108 S.Ct. at 926. They suggest that the District's inadequate investigation, which resulted in a conclusion that all school personnel acted properly, was essentially a ratification of the unconstitutional searches. However, the clear import of *Praprotnik* is that a local government may be held liable for a constitutional tort when policymakers have had the opportunity to review subordinates' decisions before they become final.[12] *See id.* That is not the case at bar. Here, the District had no opportunity to measure Morgan, Roberts and Billingslea's decisions to search the children against District policy until after the searches had taken place. The decision to go forward with the searches therefore cannot be deemed a "final" decision by District policymakers. Because the District had no opportunity to ratify the decision to search the children before the searches occurred, the students' reliance on *Praprotnik* to support their claim that the District ratified the unconstitutional conduct is misplaced.

### County Liability

The students raise three bases for their contention that the County, as Billingslea's employer, should be held liable for his unconstitutional conduct in searching the boys without individualized suspicion. The students argue that the County should be held liable because it: (1) neglected to train DARE officers on when they can act as law enforcement agents on school property; (2) failed to instruct Billingslea on the proper limits of school searches; and (3) disregarded its responsibility to properly supervise and discipline its officers.

As noted above, a local government may be held liable for a constitutional tort if its policy of inadequately training or supervising its employees caused an employee to violate the plaintiff's rights. *See Gold,* 151 F.3d at 1350. The students argue that the County's failure to train Billingslea on when he could

---

[12]Of course, a "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a[n] [unconstitutional] 'custom'..." that can subject the government to liability. *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985). However, when plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory.

act in a law enforcement capacity when visiting schools provided the moving force behind the unconstitutional searches. As we noted in our discussion of the District's liability, a need for training can be demonstrated if the County's employees "face clear constitutional duties in recurrent situations." *Young,* 59 F.3d at 1172. It is undisputed that DARE officers are generally not permitted to act as law enforcement agents while on school grounds. In fact, the students can point to no examples outside of the instant case where County DARE officers conducted searches or performed any other law enforcement duties while on school property for their DARE responsibilities. While it may have behooved the County to better define the boundaries of a DARE officer's duties, the students have failed to demonstrate that the County knew to a "moral certainty" that officers would conduct searches of school children while on campus to give DARE presentations. *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556 (11th Cir.1989).

We also agree with the district court that there is no evidence that Billingslea's lack of training on search and seizure law led to the unconstitutional searches. The students do not dispute that County officers receive training on search and seizure and that Billingslea received such training in 1988, 1992, and 1994. It is difficult to conceive how the search and seizure training that Billingslea received, which instructed him that probable cause was required before a search can be conducted, was inadequate to prepare Billingslea for conducting a school search under the less rigorous *T.L.O.* reasonableness standard. Accordingly, the district court did not err in granting the County summary judgment on the students' failure to train claim.

The students further contend that the County's failure to supervise, investigate and discipline its officers in general, and Billingslea in particular, was the moving force behind the unconstitutional searches of the boys. The students note that by the time Billingslea was transferred to the DARE program, he had at least a dozen citizen complaints in his personnel file and had been cited by his superiors for poor performance. Despite this record, the County did not suspend or terminate Billingslea and instead permitted him to become a DARE officer. The students therefore argue that the County was deliberately indifferent to the possibility that Billingslea would violate students' Fourth Amendment rights when he visited schools as part of the DARE program. Even if we assume, however, both that the allegations of every citizen complaint filed against Billingslea were true and that the County had a policy of not disciplining its officers, the students have failed to meet their burden of showing that the County's policy led to the unconstitutional searches. *See Gold,* 151 F.3d at 1350. Neither the citizen complaints filed against Billingslea, nor the County's internal reviews gave any indication that Billingslea had a tendency to search citizens without

reasonable suspicion. Therefore, the County's alleged failure to discipline Billingslea cannot be the basis for holding the County liable for the searches in this case. *See id.* at 1353.

The students also contend that the County's failure to maintain an effective Internal Affairs Unit in the police department set in motion the events that led to the unconstitutional searches. The failures of the County's system, in the students' view, created a permissive climate within the police force that led officers like Billingslea to conclude that they would not be disciplined for violating the rights of citizens. We have previously noted that evidence that a law enforcement agency routinely failed to log citizen complaints may, along with other evidence, permit an inference that the agency was deliberately indifferent to the rights of citizens. *See Vineyard v. County of Murray, GA.,* 990 F.2d 1207, 1212 (11th Cir.1993). Keeping a record of complaints allows officials to determine whether a "particular officer may have a problem that could be corrected through reassignment, discipline or training." *Id.* In the case at bar, however, there is no evidence in the record to suggest that citizen complaints were ignored or not investigated. Instead, the students rely on other problems of the system, including that: (1) the disposition of some complaints, including those made against Billingslea, were not noted in the logs; (2) officers were not informed of the disposition of complaints unless the complaints were found to be valid; and (3) citizens were rarely, if ever, informed about the results of a complaint. These failures in the County's system are certainly nothing to be celebrated. We conclude, however, that the problems in the County's system do not give rise to an inference that the County was being deliberately indifferent to the potential illegal conduct of its officers. The district court therefore did not err in granting the County's motion for summary judgment on the failure to supervise or discipline claim.

*Declarative and Injunctive Relief*

Finally, we conclude that the district court did not abuse its discretion in denying the students' requested declaratory and injunctive relief. The district court correctly found that the declaratory relief sought, a declaration that the searches were unconstitutional, was unnecessary in light of the district court's order to that effect. The students also requested injunctions requiring the District and the County to: (1) correct the identified policy and training deficiencies; (2) prevent officials from conducting searches under facts similar to those of the instant case; and (3) expunge all references to the searches from District and County records to avoid the children being tainted by the suggestion of criminality. If there were deficiencies in the District and County's policies and training, they were not the driving force behind the constitutional violations. Accordingly, the court did not err in declining to compel the District and County to alter their

policies.

The district court also correctly declined to enjoin the County and the District from searching children in the manner Morgan and Billingslea did in this case. It is now clearly established law in this circuit that the searches were unconstitutional. An injunction ordering the County and the District to "obey the law" would serve little purpose. *Burton v. City of Belle Glade,* 178 F.3d 1175, 1200 (11th Cir.1999). Finally, the court did not err in rejecting the students' request for expungement. It is undisputed that the students' individual school records hold no reference to the searches. The only reference to the searches held by the County is included in Billingslea's personnel file. Since the remaining references to the searches in the District's files can have no effect on the students' future in the school system or elsewhere, there is no danger that the children will be tainted with the suggestion of criminality. We further conclude, as did the district court, that retaining some record of the searches would be a valuable tool in preventing future constitutional violations in the District's schools. Therefore, the district court did not abuse its discretion in declining to order the expungement of all references to the searches.

*Conclusion*

We hold that strip searching the children without individualized suspicion in order to find an envelope containing twenty-six dollars was unreasonable and therefore a violation of the Fourth Amendment. Billingslea's limited search of Lenard Grace, however, was not unreasonable given the circumstances. Accordingly, we affirm the grant of summary judgment to all defendants on Lenard's claims. We also affirm the court's grant of summary judgment based on qualified immunity to the individual defendants on the claims of the remaining children. The district court's grant of summary judgment to the District and County, as well as its denial of declaratory and injunctive relief, are similarly affirmed.

AFFIRMED.

RONEY, Circuit Judge, specially concurring:

I fully concur in the decision of the court to affirm the district court's judgement for the defendants in this case, and I fully concur in the decision that the individual defendants are entitled to qualified immunity. I have more doubt as to the constitutional analysis and the parameters of the circumstances that require individualized suspicion. Certainly neither the district court nor this court holds that individualized suspicion is required in every school situation. The search probably went too far in this case to be classified as reasonable, and I do not fault the Court for deciding this rises to a constitutional level, following the somewhat unclear guidance of prior cases.

It appears to be common knowledge, however, that schools are in distress because of problems in maintaining discipline. Courts should be cautious in imposing constitutional theory that well fits individual adults in general societal situations upon the group requirements of elementary public schools. The principles that guide a decision as to reasonableness in one situation may not be too useful in the other. School children have a basic right to receive an education, which should not be trumped by the play of peripheral "constitutional rights." As I understand the court's opinion, however, and that of the district court, no hard and fast rule has been established, and there seems to be room for teachers and school authorities to on occasion act in a way that might be considered "unreasonable" in a common sense view, without being held to be "constitutionally unreasonable."